UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

CAROLYN D. RANDALL,               )
                                  )
            Plaintiff,            )
                                  )
        v.                        )        No. 4:09 CV 02 HEA
                                  )                        DDN
                                  )
 MICHAEL J. ASTRUE,               )
Commissioner of Social Security,  )
                                  )
            Defendant.            )

**REPORT AND RECOMMENDATION OF**
**UNITED STATES MAGISTRATE JUDGE**

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security, terminating Carolyn D. Randall's entitlement to disability insurance benefits under Title II and supplemental security income under Title XVI of the Social Security Act (the Act), 42 U.S.C. § 401, et seq. The action was assigned to the undersigned United States Magistrate Judge for review and a recommended disposition under 28 U.S.C. § 636(b). For the reasons set forth below, the undersigned recommends that the ALJ's decision be reversed and remanded.

**I.  BACKGROUND**

Plaintiff Carolyn Randall was born on March 13, 1961. (Tr. 18.) She is 5'9" tall with a weight that has ranged from 215 pounds to 220 pounds. (Tr. 379, 383.) She is divorced with three adult children. (Tr. 383.) She completed the 9th grade, and is able to read and write. (Tr. 18.) She last worked as a hotel housekeeper, cafeteria server, and dry cleaner worker.

On July 30, 1998, Randall applied for disability insurance benefits and supplemental security income, alleging she became disabled on June 25, 1998. (Tr. 44, 46.) After a hearing, the ALJ approved benefits on May 25, 1999, finding Randall had become disabled on June 25, 1998, based on her depression and back pain. (Tr. 32-43.)

On February 15, 2006, the Commissioner determined that Randall was no longer disabled, and terminated her entitlement to benefits, effective April 15, 2006. (Tr. 46-47, 72.) After a hearing on March 6, 2007, the ALJ upheld this decision on May 24, 2007. (Tr. 14-28, 763-814.) A different ALJ held a supplemental hearing on July 1, 2008. (Tr. 744-53.) On November 4, 2008, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 7-10.)

## II. ADMINISTRATIVE RECORD

During a trial work period, Randall worked for seven months between November 2000 and December 2001. (Tr. 67, 137.) During that period, her earnings, per month, ranged from $315.78 to $1,155.73. (Tr. 137.) Overall, she earned $5,489.67 in 2001. (Tr. 143.) Randall worked one month in 2002, and made $419.80. (Tr. 137.) Finally, she worked from June 2003 until August 2004. During that period, her earnings, per month, ranged from $184.33 to $415.68. (Id.) Overall, she earned $2,459.55 in 2003, and earned $1,677.87 in 2004. (Tr. 143.)

Randall worked at the Oak Grove Inn, doing laundry, from May to June 2006. She worked fifteen hours a week, but stopped working because of her medical condition. (Tr. 243-48.) She worked at Community Alternatives, as a clerk or typist, from October 2003 to April 2004. She worked about fifteen to twenty hours a week, but stopped working because of her medical condition, and her broken foot. She worked at the Salvation Army, as an intake worker, from October 2000, to January 2002. She worked thirty hours a week, but stopped working because of a psychotic episode. She worked at Motel 6, as head housekeeper, from January 2001, to May 2001. She worked about twenty hours a week, but stopped working after she got sick and had back problems. (Tr. 196-98.)

Randall's pharmacy records from March 2004 to March 2007 reveal she took Amoxicillin, Celebrex, Citalopram, Clonazepam, Codeine, Cyclobenzaprine, Cymbalta, Dicloxacillin, Floxin, Fluconazole, Fluoxetine, Ibuprofen, Ketorolac, Lactulose, Lamictal, Lipitor,

Lovastatin, Meclizine, Naproxen, Protonix, Ranitidine, Risperdal, Seroquel, Tramadol, Trazodone, and Vytorin.[1]  (Tr. 536-40, 262.)

On May 25, 1999, Randall saw Joseph Sherrill, M.D., following a 360-degree fusion on January 6, 1999.  Randall noted her right leg pain was completely gone, and that she had no pain in the midline.  Dr. Sherrill found she could move nicely and had lost some weight.  Dr. Sherrill wanted Randall to begin back extension exercises and physical therapy, and to slowly wean herself from using the back brace.  He wanted her to stay off work for an additional thirty days, but after that, "she should be able to return to either the job she has now, or do another job in retail without any difficulties at all.  At this point, she has a quite satisfactory x-ray set. . . ."  (Tr. 441.)

On October 1, 2001, Randall saw Dr. Sherrill.  She had back pain, but no leg pain.  X-rays of her lumbar spine revealed a good bony union.  Pain films failed to show a lytic lesion, and the spine film was unremarkable, except for some spondylosis.[2]  Dr. Sherrill gave her non-

---

[1]Amoxicillin, Dicloxacillin, and Floxin are used to treat a wide variety of bacterial infections.  Celebrex is an anti-inflammatory drug used to treat arthritis.  Citalopram, Cymbalta, and Trazodone are antidepressants used to treat depression, major depression, and anxiety.  Clonazepam is used to treat seizure disorders and panic attacks.  Codeine is a drug with a narcotic component, used to treat mild to moderate pain.  Cyclobenzaprine is a muscle relaxant used to treat muscle pain and spasms.  Fluconazole is used to treat a variety of fungal and yeast infections.  Prozac, or Fluoxetine, is used to treat depression, anxiety disorders, and obsessive-compulsive disorder.  Ibuprofen, or Motrin, is an anti-inflammatory drug used to relieve pain and swelling.  Lactulose is a laxative, used to treat constipation.  Lamictal is used to prevent or control seizures.  Lovastatin, Lipitor, and Vytorin are used to lower cholesterol.  Meclizine is an antihistamine, used to prevent nausea, vomiting, and dizziness.  Naproxen and Tramadol are used to relieve mild to moderate pain from various conditions.  Protonix is used to treat acid-related stomach and throat problems.  Ranitidine is used to treat stomach ulcers.  Risperdal and Seroquel are anti-psychotic drugs, used to treat mental and mood disorders like bipolar disorder or schizophrenia.  WebMD, http://www.webmd.com/drugs (last visited February 20, 2010).

[2]A lytic lesion is the destruction of an area of bone due to a disease, such as cancer.  National Cancer Institute, http://www.cancer.gov/dictionary/?CdrID=349382 (last visited February 20, 2010).  Spondylosis is the stiffening or fixation of the joints
(continued...)

narcotic medication for her pain and spasm. Her motor, sensation, and reflexes were all intact, and Dr. Sherrill felt "a bit hard pressed as to be certain of what is exactly going on with her." (Tr. 442.)

On January 23, 2004, Randall went to the emergency room, complaining of pain when urinating, and lower abdominal and lower back pain for the past two days. Randall smoked a few cigarettes a day, and denied using drugs or alcohol. She was diagnosed with a urinary tract infection, and discharged home, in stable condition. She was to take Septra and Pyridium.[3] (Tr. 298-304.)

On March 9, 2004, Randall saw George T. Griffing, M.D., complaining of chronic back pain, and chest pains radiating to her back. The pain was moderate, but severe. She had recently gained sixty pounds on Seroquel. A review of her systems was unremarkable. A physical examination showed her vital signs were normal, and that she was alert, oriented, and in no acute distress. Her lungs were clear and her heart was regular. There was no clubbing, cyanosis, or edema in the extremities.[4] Her mood and affect were appropriate. Dr. Griffing diagnosed her with significant hyperlipidemia, and planned to start her on cholesterol-lowering drugs.[5] He also planned to test her back pain, stop her Seroquel, and continue her therapy for gastroesophageal reflux disease (GERD). (Tr. 266-67.)

---

[2](...continued)
within the vertebra. <u>Stedman's Medical Dictionary</u>, 1456 (25th ed., Williams & Wilkins 1990).

[3]Septra is used to treat a wide variety of bacterial infections. Pyridium is used to relieve the symptoms caused by irritation of the urinary tract. WebMD, <u>http://www.webmd.com/drugs</u> (last visited February 20, 2010).

[4]Cyanosis occurs when the skin becomes purple and blue due to deficient oxygenation of the blood. <u>Stedman's Medical Dictionary</u>, 383. Edema is an accumulation of watery fluid in cells, tissues, or cavities. <u>Id.</u>, 489.

[5]Hyperlipidemia is the presence of an abnormally large amount of lipids in the circulating blood. <u>Stedman's Medical Dictionary</u>, 741, 884.

On March 29, 2004, Dr. Griffing interpreted an electrocardiogram (EKG). The results showed a low likelihood for the presence of ischemia and normal systolic function.[6] (Tr. 290.)

On April 13, 2004, Randall went to the emergency room, complaining of sharp pain in her abdominal area. All systems reviewed were negative. She was diagnosed with a urinary tract infection. (Tr. 308-12.)

On April 22, 2004, Randall went to the emergency room, complaining of left ankle pain after she tripped, and fell down the stairs. She denied any other pain. A physical exam showed her left ankle was swollen, but that there was no gross deformity. A physical assessment showed she was alert and oriented, with clear speech. Her breathing was clear and spontaneous, and her back was stable. She noted marijuana use. Randall was diagnosed with distal fibular fracture of the left ankle, with possible chip fracture of the tibia. The doctor recommended a bulky splint and crutches, and prescribed Percocet for the pain.[7] (Tr. 320-33.)

On May 12, 2004, Randall went to the hospital, complaining of acid reflux, persistent crying, and persistent vomiting. She denied any suicidal ideation. A physical assessment showed she was alert and oriented, with clear speech. A back exam showed no complaints. (Tr. 336-37.)

On July 12, 2004, Randall went to the hospital, complaining of anxiety and paranoia. She stated her lips had been turning white, she felt confused about her medications, had side pain, and had trouble sleeping. She noted having anxiety attacks for the past two to three days, that developed abruptly, and lasted about ten minutes. During these attacks, she had hot flashes, sweating, nausea, and dizziness. She also complained of crying spells, and decreased interest, energy,

[6]Ischemia is local anemia due to mechanical obstruction (mainly arterial narrowing) of the blood supply. Stedman's Medical Dictionary, 803.

[7]Percocet is an opiate-type medication, used to relieve moderate to severe pain. WebMD, http://www.webmd.com/drugs (last visited February 20, 2010).

and appetite. Her sister reported that Randall had mood swings, punctuated by periods of crying and then periods of joyfulness. She noted smoking cigarettes and marijuana. A physical exam showed that Randall was more upset than usual, and was crying. She had a flat affect and soft voice. Randall noted taking Xanax in the past, and that it worked well.[8] Her psychiatrist had taken her off Seroquel, and Randall had run out of Lamictal. (Tr. 341-47.)

Dr. J. Lang noted that Randall had been diagnosed with bipolar disorder and panic disorder a year ago. She was currently taking Ranitidine, Lovastatin, Lamictal, and Prozac. She smoked a pack of cigarettes a week, used marijuana often, but denied alcohol use. Dr. Lang found her affect reactive and her mood anxious. She was alert and oriented, without any hallucinations. Her thought process was logical and sequential. Dr. Lang diagnosed her with Type 1 bipolar disorder, panic attacks, a history of panic disorder, and assigned her a GAF score of 55-60.[9] Randall was doing better with a dose of Ativan, and was told to continue taking Prozac.[10] She was discharged home. (Tr. 347-50.)

On July 27, 2004, Randall saw James M. Jackman, D.O., three months after surgery on her left ankle. A physical examination showed no

_____

[8]Xanax is used to treat anxiety and panic disorders. WebMD, http://www.webmd.com/drugs (last visited February 20, 2010).

[9]Bipolar disorder, also known as manic-depressive illness, is a brain disorder that causes unusual shifts in mood, energy, activity levels, and the ability to carry out day-to-day tasks. Symptoms of bipolar disorder are severe. National Institute of Mental Health, http://www.nimh.nih.gov/health/publications/bipolar-disorder/complete -index.shtml (last visited February 20, 2010).
    A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components. On the GAF scale, a score from 51 to 60 represents moderate symptoms (such as flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (such as few friends, conflicts with peers or co-workers). Diagnostic and Statistical Manual of Mental Disorders, 32-34 (4th ed., American Psychiatric Association 2000).

[10]Lorazepam, or Ativan, is used to treat anxiety. WebMD, http://www.webmd.com/drugs (last visited February 20, 2010).

inflammation and no drainage.  There was no tenderness at the incision site, and her motor and neurovascular status were intact.  She had full strength.  Dr. Jackman instructed Randall to gradually wean herself from the Aircast boot and use of the cane.  (Tr. 455.)

On June 9, 2005, Jon Shields, M.D., interpreted an x-ray of Randall's hip.  The x-ray showed no evidence of any abnormality.  (Tr. 294.)

On June 18, 2005, Randall went to the hospital, complaining of a sore throat.  During a physical assessment, she noted chronic back pain. She was diagnosed with pharyngitis, and prescribed Ibuprofen.  (Tr. 358-62.)

On June 28, 2005, a note from SLU Care indicated that Randall had called, requesting refills of her medication.  The note stated that no refills would be provided until Randall kept her appointments.  On July 27, 2005, a pharmacy called, with Randall requesting a refill.  SLU Care informed the pharmacy that it should not issue the refills until Randall had been evaluated.  (Tr. 462.)

On July 22, 2005, Randall went to the hospital, complaining of lower abdominal pain, 10/10.  A physical assessment showed her abdomen was tender.  She was alert and oriented, with clear speech.  She had no complaints during a back exam, and was able to move all extremities, with sensation intact.  (Tr. 365.)

On August 30-31, 2005, Randall went to the hospital, complaining of right ear pain.  A physical assessment showed she was alert, calm, and had clear speech.  She had no complaints during a back exam, and was able to move all extremities, with sensation intact.  She was diagnosed with inflammation of the ear, depression, and GERD, and directed to stop smoking.  (Tr. 371-81.)

On September 1, 2005, Randall saw Dr. Elizabeth Quirk and Danielle Carpenter, MS, complaining of right ear pain.  A physical examination showed Randall was uncomfortable, but in no acute distress.  Her right ear was swollen.  (Tr. 275-77.)

On September 10, 2005, Randall completed a continuing disability report.  She suffered from bipolar disease, heavy anxiety, and manic

depression.[11]  She had a spinal cord disease that caused her back to break, and had undergone spinal fusion twice.  She suffered from chronic pain.  She was unable to get through a full day without her back going out, and she could not stand or sit for long periods of time.  In April 2004, she had broken her leg and ankle, which required surgery.  Her current medications included Seroquel, Prozac, Tramadol, Lovastatin, and Ranitidine.  She needed a cane for walking, could not exercise, and did not think she could walk a block on her own.  She was able to care for her personal needs on her own, but it could take all day.  She was able to do her own cooking, cleaning, and shopping.  When she cleaned, it took all day, and when she went shopping, she needed help lifting materials.  Randall drove, on her own, because she was unable to walk. She did not take the bus because she disliked being around people.  (Tr. 186-91.)

In her remarks, Randall said her health prevented her from working an extended period.  Her back caused her constant pain, and her mental impairments were "wishy washy."  Her thoughts got "jammed up" and her medication kept increasing, which made her feel like a zombie.  Finally, she complained that her medication was causing her to gain weight.  (Tr. 191-93.)

On September 21, 2005, Randall saw Farzana Amin, M.D., at SLU Care Psychiatry.  Randall stated she had messed up her medication, and was so sedated, that she was only taking Seroquel and Prozac.  She had been feeling paranoid and seeing visions.  She was crying a lot and feeling more depressed.  She denied any auditory hallucinations and suicidal or homicidal ideation.  A mental status examination showed she was alert and oriented.  Her speech was clear and spontaneous, but her mood was not good, and her affect was depressed and anxious.  She was paranoid, and showed moderate insight and fair judgment.  (Tr. 465.)

On October 14, 2005, Randall completed a function report.  In a typical day, she would wake up and then relax.  Her medication left her

---

[11]Mania is an emotional disorder characterized by euphoria, increased psychomotor activity, rapid speech, flight of idea, decreased need for sleep, distractability, grandiosity, and poor judgment.  It usually occurs in bipolar disorder.  <u>Stedman's Medical Dictionary</u>, 919.

feeling zoned out, but she needed it to function. In the afternoon, she cleaned the house, which took her all day, because she needed to take breaks due to the pain and anxiety. Randall sometimes cared for her grandchildren, feeding them and changing their diapers, though her back pain made it difficult to hold them for long periods. Randall prepared her meals, but mostly used the microwave. She also cleaned and did laundry, but it took her all day. She went out everyday, and was able to drive on her own. She went shopping with her son, because she could not carry anything, or stand in line. She saw her family on Sundays. Randall complained of blanking out, and forgetting what she was doing. She could not walk more than a half-block, before needing rest. She did not deal well with stress, she got nervous easily, and suffered from depression. She had visual hallucinations, and before she started taking her medication, was very suicidal. She walked with a cane when she was tired. (Tr. 203-10.)

In her remarks, Randall noted living in fear of others and in fear of messing up. She attributed these feelings to major abuse growing up. Randall had tried working, but experienced pain after just one or two hours of work. She noted constant back, neck, and leg pain. (Tr. 210.)

On October 28, 2005, Irma Wagner, Randall's friend, completed a third-party function report. Wagner had known Randall for ten years. She noted that Randall cared for her grandchildren and had no problems with personal care, but that she suffered from chronic pain, and tired easily. Wagner went shopping with Randall, and noted that Randall's sons helped her with the heavy items. Randall did little walking, and did not have enough of an attention span to finish what she started. She walked with a cane, cried a lot, and walked off her job at the Salvation Army. (Tr. 211-19.)

On December 19, 2005, John S. Rabun, M.D., completed a neuropsychiatric evaluation of Randall. Randall complained of back pain, but was in no obvious acute distress. She was able to focus, concentrate, and respond appropriately to questions. She complained of depression, but had no homicidal or suicidal ideas, no delusions, and stated she had never experienced auditory hallucinations. A neurological exam showed her cranial nerves were intact. A motor exam

showed no muscle atrophy. Despite complaints of back pain, she had normal range of motion in her shoulders, elbows, knees, hips, and the lumbar spine. She had full strength in upper extremity, lower extremity, and grip, with no pronator drift in the upper extremity. She had normal sensation throughout, and normal coordination. Randall was able to walk on her heels and toes for several steps. She used a cane, but Dr. Rabun found she was able to walk without it. "In fact, at the end of the evaluation, she carried the cane out of the examiner's office." The exam revealed pain in the lower back, but no specific changes. (Tr. 382-86.)

A mental status exam showed Randall was pleasant and cooperative, though she complained repeatedly of lower back pain. "She acted as though she was uncomfortable, but in no acute distress." She was able to focus, concentrate, and respond appropriately. Her thought flow was logical, sequential, and goal-directed. Her thought content did not reveal any acute signs of depression, and her affect was appropriate. She did not relate any specific signs suggesting panic attacks. Her insight and judgment were preserved. Dr. Rabun diagnosed Randall with recurrent major depressive disorder, but in full remission, and assigned her a GAF score of 65.[12] He added that Randall did not show signs of major depression, given her ability to focus and remember instructions. He also noted that Randall had full range of motion, despite complaints of lower back pain, and that she was able to walk without a cane. (Tr. 383-84.)

On December 22, 2005, Randall saw Dr. Sherrill. He noted she had recovered from her pain, and that he had not seen her for a few years. She had recently been in a car accident, and reported difficulties with her hip since the accident. She had some element of lower back pain, which Dr. Sherrill believed would be with her forever. A physical examination showed her gastroc strength was good, and that a straight

---

[12]On the GAF scale, a score from 61 to 70 represents mild symptoms (such as depressed mood and mild insomnia), or some difficulty in social, occupational, or school functioning (such as occasional truancy, or theft within the household), but the individual generally functions pretty well and has some meaningful interpersonal relationships. Diagnostic and Statistical Manual of Mental Disorders, 32-34.

leg maneuver did not cause her pain, though forced leg abduction caused significant pain.  (Tr. 444.)

On December 28, 2005, Randall went to Adult Psychiatry.  She was on time, and noted feeling somewhat depressed.  One of her adult sons had been verbally abusive to her.  She continued to be paranoid that people were watching her.  She denied any auditory hallucinations.  She worried that her boyfriend was cheating on her.  She noted no side effects from her medication.  Randall drank some vodka the day before, and had been using marijuana off and on.  She was diagnosed with severe depressive disorder and marijuana abuse.  Randall was going to continue on Seroquel, but was going to be weaned from the Prozac.   She was going to be given a trial of Cymbalta.  (Tr. 467.)

On January 17, 2006, R. Taxman, a medical consultant and internist, completed a physical residual functional capacity assessment.  Taxman found Randall had the capacity to occasionally lift twenty pounds, frequently lift ten pounds, stand for six hours in an eight-hour day, and sit for six hours in an eight-hour day.  (Tr. 387-94.)

On January 24, 2006, Randall saw James Jackman, D.O., complaining of sharp pain in the trochanter region.  A physical examination showed Randall had full range of motion in her hip, without difficulty.  There was some tenderness over the greater trochanter.  X-rays showed a healed left fibula fracture in the ankle, with plate and screw fixation unchanged.  Dr. Jackman diagnosed Randall with a left ankle fracture, healed with painful hardware, and left trochanteric bursitis.[13]  Dr. Jackman injected Randall with Lidocaine at the trochanter, and planned to remove one of the screws from Randall's ankle.  (Tr. 457.)

On February 10, 2006, Judith McGee, Ph.D., completed a mental functional capacity assessment.  Dr. McGee found Randall had nothing more than a moderate limitation in her ability to understand and remember, sustain concentration, interact socially, and adapt.  Dr. McGee concluded that Randall had the ability to understand, remember,

---

[13]Trochanteric bursitis is inflammation of the bursa (fluid-filled sac near a joint) at the outside point of the hip known as the greater trochanter.  When this bursa becomes irritated or inflamed, it causes pain in the hip.  Stedman's Medical Dictionary, 221-22, 1639.

and carry out simple tasks and instructions, but would perform more effectively in an environment with limited social interaction. (Tr. 395-98.) After a psychiatric review technique, Dr. McGee diagnosed her with major depression and anxiety, and concluded she had mild limitations in daily living and maintaining concentration, and moderate limitations with maintaining social functioning. Dr. McGee did not have enough information to determine whether Randall had suffered any episodes of decompensation. (Tr. 399-411.)

On February 14, 2006, Randall completed a disability report appeal. Her chronic pain, spinal cord, nerves, hip pain, and depression all had become worse. A second ankle surgery was scheduled in a few days. In her remarks, she complained of being moody and unable to tolerate being around other people. (Tr. 220-26.)

On February 17, 2006, Dr. Jackman removed hardware from Randall's left ankle. A year ago, Randall had fractured her ankle, and needed surgery with screws. Her ankle fracture and ligament damage had healed, but the screw was causing her pain. Dr. Jackman removed the screw without complication. (Tr. 415-17, 493-506.)

On March 15, 2006, Dana Randall completed a function report on behalf of his mother. Randall was nervous, experienced anxiety attacks, and spent most of the day pacing. She got confused about whether or not she had taken her medication. Dana noted his mother slept a lot, cried a lot, and would not eat. In his remarks, Dana noted his mother forgot her medicine, paced all day, suffered from back pain, hip pain, swollen hands, and swollen legs, and was depressed. She complained of seeing shadows and spirits, talked to herself, and suffered from a split personality. (Tr. 227-34.)

On June 7, 2006, Randall's chart at SLU Care was closed. She had not been seen in the clinic in over six months. She had failed to keep appointments on February 22, 2006, and March 22, 2006, and called in a refill on April 20, 2006. On June 30, 2006, she requested refills, but no refills were authorized since her chart had been closed. (Tr. 482.)

On July 5, 2006, Randall completed a disability report appeal. She thought she was getting worse. She was having blackouts and dizzy spells, chronic pain, and her feet and ankles swelled after a half-hour

of standing on them. She felt fatigued all the time. She could care for her personal needs, but when she was having a bad day, she stayed in her bed all day. (Tr. 235-42.)

On July 11, 2006, Randall went to the hospital, complaining of pain in her hip, neck, and back, after her car was rear-ended. She rated the pain as 9/10. Randall was crying, and stated that she had recently lost her job because of medical issues. A physical exam showed Randall was anxious and in distress. An x-ray of the lumbar spine showed the hardware was stable, and that there was no evidence of subluxation or any acute fractures.[14] She was diagnosed with lower back strain, and discharged home, in stable condition. She was to continue taking Naproxen and Flexeril, get rest, and apply ice and heat to the affected areas.[15] (Tr. 509-16.)

On August 3, 2006, James Douglas Schoen, M.D., reviewed an MRI of Randall's lumbar spine. The results of the MRI were somewhat limited because of the metal screws in her back, from an earlier fusion. That said, the MRI showed no evidence of herniation, canal stenosis, or foraminal stenosis, at L1-2, L2-3, L4-5, or L5-S1.[16] There was mild posterior bulging with minimal facet arthropathic changes at L3-4, which

_____

[14]Subluxation is an incomplete dislocation. The normal relationship is altered, but there is still some contact between joint surfaces. Stedman's Medical Dictionary, 1494.

[15]Flexeril is a muscle relaxant and is used with rest and physical therapy to decrease muscle pain and spasms. WebMD, http://www.webmd.com/ drugs (last visited February 20, 2010).

[16]Stenosis is the narrowing or constriction of any canal. Stedman's Medical Dictionary, 1473. Spinal stenosis refers to the narrowing of the spinal cord. Spinal narrowing does not always cause problems, but if the narrowed areas compress the spinal cord or spinal nerves, pain symptoms may develop. MayoClinic.com, h t t p : / / w w w . m a y o c l i n i c . c o m / h e a l t h / s p i n a l - stenosis/ds00515/dsection=symptoms (last visited February 10, 2010).
The human spinal column consists of thirty-three vertebrae. There are seven cervical vertebrae (denoted C1-C7), twelve thoracic vertebrae (denoted T1-T12), five lumbar vertebrae (denoted L1-L5), five sacral vertebrae (denoted S1-S5), and four coccygeal vertebrae (fused together into one bone, the coccyx). The cervical vertebrae form part of the neck, while the lumbar vertebrae form part of the lower back. The sacrum is immediately below the lumbar vertebrae. Stedman's Medical Dictionary, 226, 831, 1376, 1549, 1710, Plate 2.

produced mild foraminal stenosis, but no canal stenosis.[17]  (Tr. 477.)

On September 13, 2006, an MRI of the brain showed no acute intracranial pathology and no abnormal enhancements.  (Tr. 479.)

On September 19, 2006, Randall was complaining of continuing chest pain.  An x-ray, stress test, and EKG were all normal.  An MRI also showed no acute processes or enhancing masses.  (Tr. 472.)

On September 26, 2006, Randall saw Armin Rahimi, D.O., at Pain Management Services, complaining of lower back pain that was constant and extended to the hips.  She also had paresthesia of the right leg, but denied any numbness in either leg.  According to her medical history, Randall had required three or four psychiatric hospitalizations, and twice attempted suicide by overdose.  Randall was currently looking for a new psychiatrist.  She had missed a few appointments at SLU, and the university had closed her case. (Tr. 526.)

A physical examination showed Randall had an abnormal gait.  Her lumbar range of motion was decreased in extension and flexion from the lower back pain.  Heel and toe standing was present and symmetrical.  She had full muscle strength in both legs, and straight leg raising was negative.  There was no appreciable muscle atrophy in either leg.  Dr. Rahimi diagnosed Randall with lower and middle back pain, right lower extremity radiculitis, and lumbar myofascial pain.[18]  Dr. Rahimi injected Randall with steroids in the caudal region, and would consider physical therapy.  He would not recommend opioid therapy in light of Randall's history of attempting suicide.  (Tr. 526-30.)

On October 22, 2006, Randall went to the hospital, complaining of pain and pressure in the pelvis, and pain and bleeding while urinating.  At the time, she was taking Seroquel, Protonix, Aspirin, Lipitor, and

---

[17]The facet joints are small stabilizing joints located between and behind adjacent vertebrae.  See Stedman's Medical Dictionary, 556.  Facet arthropathy refers to the pain and discomfort caused by the degeneration of the facet joints.  Back.com, http://www.back.com/causes-mechanical-facet.html (last visited February 20, 2010).

[18]Radiculitis is inflammation of the spinal nerve roots.  Stedman's Medical Dictionary, 1308.  Myofascia is the fibrous tissue surrounding and separating muscle tissue.  Id., 565, 1016.

Pyridium.  She was diagnosed with a urinary tract infection.  (Tr. 517-23.)

On February 12, 2007, Randall went to Community Alternatives.  The progress notes indicated Randall was living with her niece, but felt the house was haunted.  She was taking her medication regularly, but she did not sleep well.  She felt weak and tired, and was always depressed and in chronic pain.  (Tr. 715.)

On March 27, 2007, Mirela Marcu, M.D., a psychiatrist at Community Alternatives, completed a mental medical source statement.  Randall had marked or extreme limitations with respect to daily living activities, moderate and marked limitations in social functioning, and moderate and marked limitations in concentration, persistence, or pace.  She had one or two episodes of decompensation.  Dr. Marcu believed Randall was disabled starting in 2004.  She diagnosed her with bipolar affective disorder with psychosis, and assigned her GAF score of 40.[19]  Her highest GAF score over the past year had been 50.[20]  (Tr. 542-45.)

On July 9, 2007, Randall went to the hospital, complaining of back pain.  She had felt a "pop" in her back, after leaning over the day before.  She also had numbness and pain down her left leg, but did not have any difficulty with bladder control.  She was able to walk with pain.  An x-ray of the lumbar spine showed no changes from an x-ray

---

[19]Psychosis is a mental disorder causing gross distortion or disorganization of a person's mental capacity, affective response, and capacity to recognize reality, communicate, and relate to others.  The disorder interferes with the individual's capacity to cope with ordinary demands of everyday life.  Stedman's Medical Dictionary, 1286.

On the GAF scale, a score from 31 to 40 means there is impairment in reality testing or communication (such as speech that is at times illogical, obscure, or irrelevant), or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (such as depressed, avoids friends, neglects family, and is unable to work).  A score of 31 to 40 represents worse than serious symptoms. Diagnostic and Statistical Manual of Mental Disorders, 32-34.

[20]On the GAF scale, a score from 41 to 50 represents serious symptoms (such as thoughts of suicide, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (such as the inability to make friends or keep a job).  Diagnostic and Statistical Manual of Mental Disorders, 32-34.

taken in November 2006.  The spine showed normal lumbar lordosis.[21]  The vertebral heights were preserved, but there was minimal subluxation at L5-S1.  The rest of the alignment was preserved, and the facets were in appropriate relationship.  Mild diffuse disk bulges at L3-4 and L4-5 did not compress the thecal sac.  There was no evidence of any spinal masses or hemorrhage.  (Tr. 562-64.)

On August 2, 2007, Kenneth Smith, M.D., found Randall's muscoskeletal system was negative, except for spasms in her back.  The cranial nerves and cerebellar were normal.  Motor sensory and reflexes were normal.  In Dr. Smith's opinion, there was nothing surgery could do, to help Randall.  In his opinion, Randall was disabled, and needed pain management.  (Tr. 708.)

On August 23, 2007, Randall saw Stanley London, M.D.  A general exam showed Randall had a bland affect and did not give sharp responses. She walked slowly, but without any obvious limp.  She could not heel or toe walk, and had trouble getting on and off the examination table. Straight leg raising was negligible because of her back pain.  She had some spasms and tenderness in her back.  Flexion, extension, tilting, and turning were all limited by her back pain.  Dr. London diagnosed Randall with lower back pain, with some radiation to her right leg.  Dr. London believed Randall could only sit, stand, or walk for fifteen minutes in an eight-hour day.  He did not think she could lift or carry any amount of weight.  Dr. London believed Randall's limitations dated back ten years.  (Tr. 702-07.)

On September 12, 2007, Randall tested negative for illegal drugs. (Tr. 713.)

On September 16, 2007, Randall went to the hospital, after having blacked out.  She stated that she was living in a shelter.  (Tr. 557-61.)

On September 17, 2007, Randall went to Community Alternatives. Randall reported having a two-week history of binging and purging episodes, in an effort to lose weight.  She had taken almost thirty

_____

[21]Lordosis is an abnormal extension deformity – usually in the form of a backward curvature of the spine.  Stedman's Medical Dictionary, 894.

laxatives in a one- to two-week period, and was inducing vomiting with each meal. She continued to complain of paranoia. She was living in a transition home. (Tr. 725.)

On October 8, 2007, Dr. Marcu completed a mental medical source statement. She found Randall had experienced four or more episodes of decompensation. She diagnosed Randall with schizoaffective disorder and post-traumatic stress disorder (PTSD), and assigned her a GAF score of 40.[22] (Tr. 709-12.)

On October 12, 2007, Randall went to the hospital, complaining of a manic episode. Over the last few days, she was pacing all the time, hyper, had racing thoughts, and had an out-of-body experience. She denied any depressive symptoms, paranoia, or suicidal or homicidal ideation. A physical examination showed Randall had full muscle strength in the upper and lower extremities. A neurological examination showed her cranial nerves were intact. Dawn Brown, M.D., diagnosed her with bipolar disorder with a manic episode, and assigned her a GAF score of 35. Randall was living in transitional housing, and had poor family support and poor coping skills. (Tr. 598-607.)

On November 21, 2007, Randall went to Community Alternatives, complaining of unstable mood swings, crying spells, increased sensitivity, and increased anxiety. She denied feeling depressed or suicidal. (Tr. 730-32.) The following week, Randall returned to Community Alternatives. She was homeless, and living at a shelter. She stated that she was taking her medication. She reported being sober for the past seven months, and not having taken crack cocaine in three years. Randall complained about having crying spells and outbursts, but

---

[22]Schizo-affective is the mixture of symptoms suggestive of both schizophrenia and affective disorder. Stedman's Medical Dictionary, 1389. Schizophrenia is a common type of psychosis, characterized by a disorder in the thinking process, such as delusions and hallucinations, and extensive withdrawal of the individual's interest in interacting with other people and the outside world. Id., 1390.

PTSD refers to an anxiety disorder that can develop after exposure to a terrifying event or ordeal in which grave physical harm occurred or was threatened. National Institutes of Mental Health, http://www.nimh.nih.gov/health/topics/post-traumatic-stress-disorder-ptsd/index.shtml (last visited February 20, 2010).

denied any hallucinations. She was often anxious, suffered from mood swings, and got into arguments with others. (Tr. 732.)

On November 28, 2007, Randall went to the hospital with flu symptoms. (Tr. 553-56.)

On December 3, 2007, Randall went to the hospital, after feeling dizzy. A mental examination showed she was alert and oriented, in no distress, and that her neurological senses were intact. (Tr. 566-72.)

On December 10, 2007, Randall went to Community Alternatives. She was feeling restless, pacing continuously, and feeling agitated. She also complained of back pain, but denied any depression or suicidal ideation. (Tr. 738.)

On December 11, 2007, Randall went to the hospital. She was pacing, hyper, and had racing thoughts. Miggie Greenberg, M.D., diagnosed her with bipolar disorder, emotional distress, neck and back pain, GERD, a history of substance abuse, and weight gain. Dr. Brown noted Randall had bipolar disorder with manic episodes, a history of marijuana abuse in remission, and an eating disorder, with no obvious symptoms. She diagnosed Randall with bipolar disorder, vertigo, insomnia, chronic pain, and substance abuse. Dr. Brown discharged Randall on December 12. (Tr. 608-13.)

On February 1, 2008, Randall saw Siva Konala, M.D., in the emergency room, complaining of chest pain that had been 10/10. During an exam, Randall denied any pain or discomfort. The pain was 0/10. A chest study showed no acute pulmonary disease. (Tr. 619-32.)

On March 5, 2008, Jawed Siddiqui, M.D., administered a stress test. Randall exercised for three minutes, before complaining of chest pain. Dr. Siddiqui found the stress test indicated coronary artery disease and low exercise capacity. He recommended a cardiac catheterization. (Tr. 681.)

On March 14, 2008, Randall saw Mohammad Tahir, M.D., complaining of chest pain. Her symptoms usually resolved with rest, but reoccurred with minimal effort. A recent exercise test showed she could only walk for two minutes. She had a positive stress EKG, which was consistent with cardiac ischemia. The cardiac catheterization showed coronary artery disease in a single vessel. Dr. Tahir diagnosed Randall with

coronary artery disease, hypertension, high cholesterol, obesity, and possible depression.  He recommended Aspirin and Plavix for her coronary artery disease, Lipitor and Niaspan for her cholesterol, and Lamictal and Geodon for her possible depression.  (Tr. 636-41.)

On April 7, 2008, Randall saw Dr. Tahir, complaining of chest discomfort with excessive sweating.  Her blood pressure had been low, but she denied any dizziness or loss of consciousness.  A musculoskeletal exam showed no evidence of abnormal curvature of the spine.  Her gait was appropriate, and her muscle strength appeared normal without any evidence of atrophy or abnormal movements.  Dr. Tahir diagnosed her with coronary artery disease with stent placement, hypertension, high cholesterol, and a history of psychiatric disorder.  Dr. Tahir prescribed Isosorbide and Mononitrate for her coronary artery disease.  (Tr. 696-99.)

On April 10, 2008, Randall went to Community Alternatives.  She had been feeling suicidal the past few weeks, but was able to overcome it.  She reported blacking out and feeling worse than during her last visit.  She denied any paranoia or suicidal ideation at the time of the session.  She reported complying with her medication.  The notes indicate Randall was to be hospitalized for safety reasons.  (Tr. 740.)

On April 14, 2008, Dr. Greenberg completed a clinical report on Randall after a recent hospitalization.  Randall had gone to Community Alternatives on April 10, complaining of increased crying spells, increased sleep, and little appetite.  She was having thoughts of suicide for the past two weeks, but without a plan.  She could distract her suicidal thoughts with television and sleep.  She exhibited some paranoia, and felt very depressed, with feelings of hopelessness and helplessness.  Randall denied any anxiety and denied not taking her medication.  She simple stated that "I feel like I want to be dead."  At the time, Randall was taking Trazodone, Ativan, Geodon, and Lamictal for her psychiatric complaints, and Plavix, Aspirin, Ranitidine, Lipitor, and Diovan for other symptoms.[23]  Randall was last hospitalized a year ago.  She noted being abused as a young child.  (Tr. 573.)

---

[23]Diovan is used to treat high blood pressure and heart failure. WebMD, http://www.webmd.com/drugs (last visited February 20, 2010).

A mental examination showed Randall was cooperative, but tearful. She stated her mood was very depressed, and she had a flat affect. She endorsed suicidal thoughts, but had no plan. She denied any auditory or visual hallucinations. Randall was hospitalized and met with a therapist. A few hours into her hospitalization, she was up and walking around. Her breathing was even and unlabored, and she denied any suicidal ideation. She did not display any aggressive behavior, and was taking her medication. Celexa was added to her medication list, in response to her severe depression. After a few days in the hospital, Randall was doing better, and she was discharged on April 14. She was eating and sleeping well, and complying with her medications. The nursing staff felt her affect was improving. During a discharge mental examination, Randall's mood was better and her thought process was goal-directed and logical. She denied any suicidal ideation. On discharge, she was to be taking Geodon, Celexa, and Trazadone. On discharge, she was diagnosed with schizoaffective disorder, bipolar type, and assigned a GAF score of 60. She had been assigned a GAF score of 15, when she was admitted to the hospital.[24]  (Tr. 573-94.)

On April 25, 2008, an EKG showed diastolic dysfunction of the left ventricle, and mild mitral valve regurgitation.[25]  (Tr. 676.) That same day, a cerebral vascular study showed less than fifteen percent stenosis in the carotid arteries, no soft plaque, and good vertebral flow. (Tr. 693.)

---

[24]On the GAF scale, a score from 11 to 20 means there is some danger the patient will hurt herself or others (such as suicide attempts without a clear expectation of death, frequently violent, manic excitement), or occasionally fails to maintain personal hygiene (smears feces) or gross impairment in communication (largely incoherent or mute). The GAF scale is divided into ten scores. A score of 11 to 20 is the second-most severe score on the scale. Diagnostic and Statistical Manual of Mental Disorders, 32-34.

[25]Mitral valve regurgitation happens when the heart's mitral valve does not close tightly, allowing blood to flow backward in your heart. This condition can cause fatigue and shortness of breath. For mild cases, treatment may not be necessary. MayoClinic.com, http://www.mayoclinic.com/health/mitral-valve-regurgitation/DS00421 (last visited February 20, 2010).

As of April 30, 2008, Randall was taking Geodon, Diovan, Aspirin, Ranitidine, Plavix, Isosorbide, Ativan, Motrin, Celexa, Bystolic, Nitroglycerin, Pravastatin, and Trazadone.[26] (Tr. 646.)

On June 4, 2008, Randall tested negative for illegal drugs. (Tr. 643.)

On June 8, 2008, Randall went to Community Alternatives. The progress notes indicated she appeared extremely anxious, paranoid, and unable to focus. She appeared very tearful. (Tr. 743.)

On June 30, 2008, Dr. Marcu completed another mental medical source statement. She found Randall had experienced three episodes of decompensation, and believed she had become disabled in 2004. She diagnosed her with bipolar affective disorder and PTSD, and assigned her a GAF score of 40-50. She wrote that Randall needed extensive psychiatric and community support, and that she needed to continue her psychiatric treatment. (Tr. 547-50.)

**Testimony at the Hearing**

On March 6, 2007, the ALJ held a hearing.[27] Randall was living with her niece for the past year. Randall believed she was unable to work because of her pain, depression, and anxiety. She had been going to Community Alternatives since 2000 for her mental impairments, though she had stopped going for about a year when she was having manic attacks. During that year, Randall had worked at a hotel, doing housekeeping work. She drove to that job, but she no longer drove because she had blackouts. Randall took Meclizine for the blackouts. (Tr. 763-72, 789-90.)

Randall had been seeing Dr. Marcu since either January 2006 or January 2007. She took a number of medications, which made her feel

---

[26]Pravastatin is used to lower cholesterol. Bystolic, or Nebivolol, is used to treat high blood pressure. Nitroglycerin is used to treat chest pain due to angina or heart attack. WebMD, http://www.webmd.com/drugs (last visited February 20, 2010).

[27]The ALJ originally held a hearing on September 26, 2006. Randall did not have a lawyer at this hearing, and the ALJ postponed the hearing to give Randall the opportunity to find counsel. (Tr. 756-62.)

like a zombie. She also saw Dr. Amin for psychiatric treatment. Randall reported using crack cocaine, but had been clean for a few years. She continued to use marijuana, though, about once a week. Randall experienced the chronic pain since 1995 or 1996. She had broken her back in 1997 and 1998. (Tr. 772-81.)

Randall worked at the Salvation Army, filling out forms. She worked there for about eight years, working from November to January, twenty-five hours a week. Randall broke her ankle in November 2005. She worked in a hotel after her ankle broke, but was fired because she was unable to bend. She tried working as a secretary for Community Alternatives, but was unable because of her panic attacks. (Tr. 781-84.)

Randall believed she missed appointments because she was sick, had trouble getting up, or had trouble getting there. She had been working with a case worker since 2002. The case worker picked her up, helped her get to her appointments, and helped calm her down. Randall had just met Chrissy Decker; she had not been her case worker for long. Randall was able to care for her personal needs, but it took her a long time. Bathing, doing her hair, and getting dressed caused her pain. Randall took Flexeril three times a day for her pain. She had been going to a pain management clinic, but stopped going because it was too far. Her social workers were trying to find her a closer one. (Tr. 784-88.)

Randall did not believe she could lift anything heavier than a pencil. She also could not stand or sit for long periods. Randall would write to pass the time. She went to drug meetings with her case worker, but otherwise, she did not go out. She simply stayed in her room. Randall had been going to drug meetings since 2000. Her son only came by about once a month, and helped her with her laundry. Some of the medication gave Randall headaches. Randall sometimes smoked marijuana while she was on her medication. (Tr. 788-93.)

Randall had worked for Saint Louis Parking about six months ago. Her job was to sit in a chair and take the tickets, but she quit the job because she could not handle sitting for such a long period, and because she could not handle interacting with people. Randall had visual hallucinations, in which she saw shadows or ghosts. She had crying

spells every day, and had recently been admitted to the hospital with thoughts of suicide. Randall's doctors did not prescribe her narcotic medication because of her history of addiction. (Tr. 793-95.)

Christine Decker, Randall's case worker at Community Alternatives, also testified during the hearing. Decker was one of twelves members of a team that tried to see Randall twice a week. Decker, herself, had seen Randall about ten times in the past two months, and believed Randall attended meetings about seventy percent of the time. Decker had spoken with Dr. Marcu one day earlier, about possibly hospitalizing Randall, after she became very hysterical. Decker encouraged Randall to interact in the community. To that end, the two had gone grocery shopping together. Randall had been going to Community Alternatives since January 2007, but had been a client before that as well. (Tr. 793-805.)

Brenda Young testified as a vocational expert (VE) during the hearing. The ALJ had the VE assume that Randall was able to lift twenty pounds occasionally, ten pounds frequently, could stand, walk, or sit for six hours in an eight-hour workday, and needed to avoid close interaction with others. With those restrictions, the VE testified that Randall could perform her past work as a hotel housekeeper. The VE noted that Randall had performed the work at the medium level, but that it was often available at the light level. Randall's left ankle problems would not interfere with the housekeeping or janitorial work. In a second hypothetical, the ALJ had VE assume that Randall could only lift ten pounds, stand or walk for two hours, sit for six hours, and needed to avoid interacting with others. With those restrictions, the VE testified that Randall could perform sedentary assembly types of work. If Randall had to miss two days a month for medical reasons, or if she had problems working an entire day, the VE believed Randall would not be capable of competitive employment. (Tr. 805-09.)

If Randall had a marked limitation in any of the daily living activities found by Dr. Marcu, the VE testified that Randall would not be able to perform her past work. If Randall had a marked limitation in accepting instructions, relating in social situations, or maintaining concentration (with the exception of responding to changes) the VE

believed those limitations would also preclude employment. The VE did not believe that marked limitations in interacting with the public and maintaining socially acceptable behavior would preclude employment. (Tr. 809-14.)

**Supplemental Hearing**

On July 1, 2008, a different ALJ held a supplemental hearing. Randall was living in an apartment that Shelter Care Plus had helped her find. Before that, she had been homeless for seven months, living at the Shalom House. She was seeing Dr. Marcu, a psychiatrist at Community Alternatives, about once a month, for the last fifteen months. Community Alternatives also took Randall to addiction meetings. Randall had a history of abusing crack cocaine and marijuana, and the meetings helped her to stay sober. She had not used marijuana in fifteen months, and had not used crack in four years. Community Alternatives also helped Randall fill her prescriptions, and remember to take her medication. Randall reported taking her medication as directed. (Tr. 744-50.)

Randall also complained of back pain, which prevented her from standing or sitting for extended periods. For that reason, her son helped her buy groceries and do laundry. She had heart problems, and doctors had put a stint in her heart in March 2008. She had been hospitalized for mental impairments the week before, following a bad anxiety attack and manic depression symptoms. She also had been hospitalized six months earlier, following manic depression and anxiety attacks. Randall had been clean and sober since May 25, 2007. (Tr. 750-53.)

### III. DECISION OF THE ALJ

Randall had been receiving disability insurance benefits and supplemental security income. On February 15, 2006, the Commissioner determined that Randall was no longer disabled, and ended her benefits on April 15, 2006. After considering the evidence, the ALJ found that Randall's disability had ended on February 15, 2006. (Tr. 17-18.)

Randall had a history of back pain and depression. She had undergone back surgery in July 1998 and January 1999, and had been hospitalized for depression and suicidal ideation in September 1998 and January 1999. Taken together, the ALJ had found Randall disabled as of June 25, 1998. Starting in 2000, Randall began working part-time, though none of the work constituted substantial gainful activity. In that same time, Randall was hospitalized several times with physical and mental impairments. (Tr. 18-19.)

After reviewing the record, the ALJ found the evidence in the record was inconsistent with Randall's allegations of continuing disability. Randall's back pain prevented her from lifting or carrying more than twenty pounds, and her mental impairments imposed certain limitations on interpersonal interaction. Taken together, these limitations prevented her from performing her past work. However, the ALJ believed that if Randall complied with her medication and did not abuse marijuana, she could perform light work that required simple, repetitive tasks, and which did not involve close interaction with others. The ALJ characterized light work as the ability to frequently lift and carry ten pounds, and the ability to lift up to twenty pounds. Looking to the testimony of the VE, the ALJ found that there were jobs meeting this criteria. (Tr. 19-22.)

In reaching this conclusion, the ALJ noted that Randall had almost completely recovered from her back pain and ankle pain. She had not required surgery or hospitalizations for physical impairments since 2004. No doctor had placed any long-term restrictions on her abilities, and there was no evidence of uncontrollable side effects from her medication. To the extent her physical activities were restricted, the ALJ believed it was by Randall's own choice. (Tr. 22-24.)

The ALJ also believed Randall's mental impairments could be stabilized if she complied with medication and avoided marijuana use. Randall abused marijuana and had a history of noncompliance with her medication. Together, these two factors negated the severity of her mental impairments. At the same time, her marijuana abuse did not seriously disrupt her normal functioning. The ALJ found Randall did not suffer from severe depression. From February 2003 up to early 2007,

Randall had no mental hospitalizations. The ALJ viewed Randall's subsequent hospitalizations as a "last-minute way of 'proving' she [was] still mentally disabled. . . ." (Tr. 24-25.)

The ALJ discounted the statements of Ms. Wagner and Ms. Decker, because they were not medically trained, and because their observations were inconsistent with the observations of medical personnel.[28] Randall's testimony was also inconsistent with the observations of medical personnel. The ALJ looked to the medical-vocational guidelines and testimony from the VE to conclude that Randall was no longer disabled, and could perform jobs in the national economy. (Tr. 25-26.)

The ALJ summarized his findings in the five-step process. At Step One, the ALJ found Randall had worked several paying jobs, but that these jobs did not qualify as substantial gainful activity. At Step Two, the ALJ found Randall suffered from back problems, ankle problems, hyperlipidemia, depression, and marijuana abuse, and that these impairments were severe. At Step Three, the ALJ found that these impairments did not meet a listed impairment. At Step Four, the ALJ found Randall had the residual functional capacity (RFC) to lift up to twenty pounds occasionally and ten pounds frequently, and to perform simple, repetitive tasks, but that she needed to avoid close interaction with others. Randall's mental impairments had shown a slight improvement. Yet, she could not perform her past relevant work. The ALJ discounted the allegations of Randall and the two witnesses as not credible. (Tr. 26-27.)

At Step-Five, the ALJ consulted the medical-vocational guidelines to provide a framework, but ultimately found that Randall's limitations prevented her from performing the full range of light-sedentary work. Accordingly, the ALJ relied on the VE's testimony to prove Randall could perform work in the national economy, and that she was not disabled within the meaning of the Social Security Act. The ALJ found Randall's disability had ended on February 15, 2006. (Tr. 27-28.)

---

[28]Irma Wagner did not testify at the hearing. (Tr. 763-814.) She only completed a third-party function report. (Tr. 211-19.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Id.  In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision.  Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently.  See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942.  A five-step regulatory framework is used to determine whether an individual qualifies for disability.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942.

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment.  Pate-Fires, 564 F.3d at 942.  If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five.  Id. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work.  Id.  The claimant bears the burden of demonstrating she is no longer able to return to her past relevant work.  Id.  If the Commissioner determines the claimant cannot return

to past relevant work, the burden shifts to the Commissioner at Step
Five to show the claimant retains the RFC to perform other work.  Id.

In this case, the Commissioner determined that Randall could not
perform her past relevant work, but that she could perform other work
in the national economy.

## V.  DISCUSSION

Randall argues the ALJ's decision is not supported by substantial
evidence.  First, she argues that the ALJ failed to conduct a function-
by-function analysis of her RFC.  She also argues the medical evidence
does not support the ALJ's ultimate RFC determination.  Second, she
argues that the medical evidence contradicts the ALJ's statement that
she did not take her prescription medication.  Third, she argues the ALJ
erred in characterizing her 2007 hospitalizations as last-minute
attempts to prove her disability.  The Social Security Administration
had originally scheduled hearings in September 2006 and December 2006,
before her hospitalizations.  (Docs. 12, 18.)

**Non-Compliance**

Evaluating mental impairments is often more complicated than
evaluating physical impairments.  Obermeier v. Astrue, Civil No.
07-3057, 2008 WL 4831712, at *3 (W.D. Ark. Nov. 3, 2008).  With physical
impairments, evidence of symptom-free periods offers strong evidence
against a physical disability.  Id.  The same is not true for mental
impairments.  Id.  With mental impairments, evidence of symptom-free
periods does not mean a mental disorder has ceased.  Id.  Mental illness
can be extremely difficult to predict, and periods of remission are
usually of an uncertain duration, marked with the ever-pending threat
of relapse.  Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001).

Adding to these difficulties, individuals with chronic psychotic
disorders often structure their lives in a way to minimize stress and
reduce their signs and symptoms.  Id.  Given the sometimes competitive
and stressful conditions in which people work, individuals with mental
impairments "may be much more impaired for work than their signs and
symptoms would indicate."  Id.; Obermeier, 2008 WL 4831712, at *3. Worse

yet, efforts to combat mental illness present their own unique difficulties. See Pate-Fires, 564 F.3d at 945. Individuals with mental illness often refuse to take their psychiatric medication - a symptom of the illness itself, rather than an example of willful noncompliance. Id. As a result, an ALJ should determine if a claimant's noncompliance is willful, or whether it is a medically-determinable symptom of the mental illness. Id.

The ALJ found that noncompliance was one possible reason for Randall's severe uncontrolled mental impairments. (Tr. 24.) However, the ALJ did not consider medical evidence to determine whether Randall's noncompliance was a result of willfulness, or whether her noncompliance was itself a symptom of her severe mental impairments. Under Pate-Fires, the ALJ erred by failing to make this critical distinction. Id. at 946 ("[W]hile there may be substantial evidence to support the ALJ's finding [that the claimant] knew she needed to take her medication, this evidence does not resolve the relevant question here: whether her failure or even refusal to follow the prescribed treatment was a manifestation of her schizoaffective or bipolar disorder.").

More importantly perhaps, substantial evidence does not support the ALJ's finding that Randall was noncompliant with her medication. On June 28, and July 27, 2005, Randall was actively calling to have her prescriptions refilled, even though she had missed her appointments. (Tr. 452.) On April 20, and June 30, 2006, Randall again called to have her prescriptions refilled, even as she again failed to keep her appointments. (Tr. 482.) Records from The Medicine Shoppe show Randall refilled her medication, on a monthly basis, from March 2004 until March 2007. The records include almost four full pages of refills for prescription drugs. (Tr. 537-40, 262.) According to these records, Randall was still taking, and refilling, her prescriptions for Citalopram, Clonazepam, Cymbalta, Lamictal, Seroquel, and Trazadone, in the weeks leading up to the March 2007 hearing before the ALJ. (Tr. 262.) These medications are used to control depression, anxiety, panic attacks, and mental and mood disorders. (See footnote 1, above.)

Even after the hearing and the unfavorable decision, Randall remained compliant with her medication. On November 21, 2007, she told

Community Alternatives that she was taking her medication. (Tr. 732.) On April 10, 2008, notes from Community Alternatives indicate that she was complying with her medication. (Tr. 740.) Finally, during the supplemental hearing, Randall testified that she was taking her medication as directed. (Tr. 750.)

The government acknowledges that substantial evidence does not support the ALJ's finding that Randall failed to comply with her medication. (Doc. 17 at 10.)

**Hospitalizations**

The ALJ also found Randall less than credible because she had no hospitalizations between February 2003 and early 2007, which made her recent hospitalizations appear to be a "last-minute way of 'proving' she [was] still mentally disabled. . . ." (Tr. 24-25.) Substantial evidence does not support this statement.

The record indicates that Randall was no stranger to the emergency room or the hospital between 2003 and 2007. In January 2004, she went to the emergency room, complaining of lower abdominal pain. (Tr. 298-304.) In April and May, she returned to the emergency room with abdominal pain and acid reflux. (Tr. 308-12, 336-37.) In July 2004, she went to the hospital, complaining of anxiety and paranoia. (Tr. 341-47.)

In July 2005, Randall went to the hospital complaining of lower abdominal pain. (Tr. 365.) A month later, she went to the hospital complaining of right ear pain. (Tr. 371-81.) In July 2006, she went to the hospital, complaining of severe hip, neck, and back pain after her car was rear-ended. (Tr. 509-16.) In September 2006, Randall told Dr. Rahimi that she had required three or four past psychiatric hospitalizations, and twice attempted suicide by overdose - though there was no indication when. (Tr. 526.) In October 2006, she went to the hospital complaining of pelvic pain. (Tr. 517-23.)

In September 2006, just before the first hearing, Randall had several hospitalizations for physical impairments, but only one hospitalization for mental impairments. The record does not show any

dramatic increase in hospitalizations leading up to the hearing on September 26, 2006, or the hearing on March 6, 2007.

Randall continued to go to the hospital after these two hearings, and after the unfavorable decision. In September 2007, she went to the hospital after blacking out. (Tr. 713.) A month later, she went to the hospital, complaining of a manic episode, and was given a GAF score associated with worse than serious symptoms. (Tr. 598-607.) In December 2007, she went to the hospital after feeling dizzy, and then again, after feeling hyper and having racing thoughts. (Tr. 566-72, 608-13.) In April 2008, she was hospitalized for suicidal thoughts, and was given the second-most severe score on the GAF scale. (Tr. 573-94.) At the time of this hospitalization, Randall had been off marijuana for close to a year, and was complying with her medication. (See Tr. 713, 732, 643, 740.)

**RFC Determination**

The RFC is a function-by-function assessment of an individual's ability to do work-related activities based on all the evidence. Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007). The ALJ retains the responsibility of determining a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians, examining physicians, and others, as well as the claimant's own descriptions of her limitations. Pearsall v. Massanari, 274 F.3d 1211, 1217-18 (8th Cir. 2001). Before determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Id. Ultimately, the RFC is a medical question, which must be supported by medical evidence contained in the record. Casey, 503 F.3d at 697; Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

As noted above, Randall complied with her medication, and there is no indication her hospital visits were precipitated by the hearing dates. Taken together, substantial evidence does not support the ALJ's credibility determination, and the case must be remanded. See Coan v. Barnhart, No. C04-4040 MWB, 2005 WL 740181, at *19-*20 (N.D. Iowa Apr. 1, 2005) (recommending the case be remanded where the ALJ incorrectly found the claimant failed to comply with her doctor's orders);

see <u>Lopez-Navarro v. Barnhart</u>, 207 F. Supp. 2d 870, 882-83 (E.D. Wis. 2002) (remanding the case where the ALJ incorrectly found the claimant to be noncompliant with medication).  On remand, the ALJ shall reevaluate Randall's credibility.  As part of this reevaluation, the ALJ should consider all the evidence in the record, as well as any new and relevant evidence that may post-date the July 1, 2008 hearing.  Because this credibility determination may affect the ALJ's RFC determination, the issue of Randall's RFC is reserved to the ALJ on remand.

## VI.   RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be reversed and remanded under Sentence 4 of 42 U.S.C. § 405(g).  On remand, the ALJ shall reevaluate Randall's credibility.  As part of this reevaluation, the ALJ should consider all the evidence in the record, as well as any new and relevant evidence that may post-date the July 1, 2008 hearing.

The parties are advised that they have 14 days to file documentary objections to this Report and Recommendation.  The failure to file timely documentary objections may waive the right to appeal issues of fact.

    /S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on March 2, 2010.